FILED

2012 Mar-29  AM 11:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **SHERYL HARVEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:10-CV-3230-VEH** |
| | ) | |
| **STANDARD INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court are the following cross-motions for judgment on the merits: Plaintiff's Motion for Judgment on the Record with Submissions (doc. 8) (the "Plaintiff's Motion for Judgment"), and Defendant Standard Insurance Company's Motion for Summary Judgment (doc. 19) (the "Defendant's Motion for Summary Judgment"). The parties have fully briefed these Motions (see docs. 9, 11, 13, 18, 20, 21, 41, 42, and 47),[1] and they are now under submission.

---

[1]  The court granted leave for the Defendant to file a sur-reply (doc. 18) to Plaintiff's Motion for Judgment in order to respond to additional material presented in Plaintiff's Reply brief (doc. 13). Additionally, the court granted leave for several documents in this case to be filed under seal, including the Defendant's reply in support of its Motion for Summary Judgment (doc. 47) and Exhibits 3 through 10 of the Plaintiff's submissions in opposition to the Defendant's Motion for Summary Judgment (doc. 42).

The court has carefully considered the parties' arguments, the evidentiary submissions and the administrative record, and the relevant applicable law. For the reasons stated in this Memorandum Opinion, the court concludes that Defendant's Motion for Summary Judgment is due to be granted and, accordingly, Plaintiff's Motion for Judgment is due to be denied.

## II.   PROCEDURAL BACKGROUND

Plaintiff Sheryl Harvey ("Ms. Harvey") is a plan participant in a short- and long-term disability benefits plan ("the Plan") issued by Defendant Standard Insurance Company ("Standard") to her former employer, Jeff Owens & Associates, Inc. (Doc. 17-1). This action involves Ms. Harvey's claims for long-term disability ("LTD") benefits under the Plan; she previously received short-term disability ("STD") benefits from the Plan but those are not an issue before this court.

The action was commenced in the Circuit Court of Etowah County. (Doc. 1, Ex. A). Standard removed the action to this court on November 24, 2010. (Doc. 1). There is no issue regarding subject matter jurisdiction. The Complaint alleges, and Standard agrees, that the action is brought under and controlled by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").

## III.   FACTUAL BACKGROUND[2]

### A.      The Group Policy

Standard issued the Certificate and Summary Plan Description Group Long-Term Disability Insurance, Policy No. 923454-B, to Jeff Owens & Associates, Inc., effective January 1, 2006 (the "LTD Group Policy" or "Plan").  (AR 464-91).[3]  The LTD Group Policy contains a 90-day benefit waiting period.  (AR 468).  To bridge the 90-day waiting period, employees were covered by a separate STD policy also issued by Standard.  (AR 865-89).  Standard paid Ms. Harvey benefits under the STD policy for the maximum benefit period.

The  LTD Group Policy covers two classes of members.  (AR 464-91).  Ms. Harvey falls under Class 2, which includes all other members (not certified public accountants).  Accordingly, she was eligible for LTD benefits based on an "Own

[2]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following underlying facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of the relevant facts pertaining to this particular case or controversy.  Specifically, these facts are adapted from the facts contained in Statement of Material Undisputed Facts in Standard's brief in support of summary judgment and that have been admitted by Ms. Harvey.  (Doc. 20 at 1-14).

[3]  A complete copy of the Administrative Record ("AR"), bates stamped Standard 000001 through 000889, is provided as Exhibit A to Standard's Evidentiary Submission in Support of its Motion for Summary Judgment (doc. 21).

Occupation" definition of disability for the first 24 months, and a broader "Any Occupation" definition thereafter.  (AR 467-68).

The LTD Group Policy provides, in pertinent part:

### DEFINITION OF DISABILITY

You are Disabled if you meet the following definitions during the periods they apply:

A.  Own Occupation Definition of Disability.

B.  Any Occupation Definition of Disability

A.  Own Occupation Definition of Disability

During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:

1.  <u>You are unable to perform with reasonable continuity the Material Duties of your Own Occupation</u>; and

2.  You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

Note:  You are not Disabled merely because your right to perform your Own Occupation is restricted, including a restriction or loss of license.

…

4

Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy. If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

(AR 473-74) (emphasis added).

Standard served as the Administrator responsible for processing and evaluating disability claims made by participants and for construing the terms of the Group Policy. (AR 464-91). The LTD Group Policy included an "Allocation Of Authority" clause that provided for Standard to "have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation and application of the Group Policy." (AR 487).

5

## B.    Ms. Harvey's Occupation

Ms. Harvey worked as a bookkeeper for Jeff Owens & Associates, Inc. for more than ten years.  The company provided a basic job description to Standard that described her duties, which included: (1) maintaining client payroll accounts, (2) sales tax reports; (3) balancing bank statements; (4) general phone and front desk responsibilities; (5) maintaining work lists of clients; (6) completing personal property tax returns; (7) Quickbooks software computer training; (8) call in request for corporate names for new corporations; (9) standard and customary office responsibilities such as filing, faxing, client contact, and (10) during tax season, logging in and assembly of client information, and pulling and distributing tax files to the accountant.  (AR 658).

## C.    Ms. Harvey's Claim for STD Benefits

Ms. Harvey came out of work on April 13, 2009 due to back pain. She completed a Disability Insurance Employer/Employee's Statement (AR 106) and also submitted an Attending Physician's Statement ("APS") by her treating physician, Thomas A. Wilson, M.D., dated April 20, 2009.  Dr. Wilson listed Ms. Harvey's diagnosis as lumbar disc degeneration and scoliosis and indicated that her symptoms were back and leg pain.  (AR 336).  He recommended that she stop working on April 13, 2009, and return for a follow-up in six weeks. (*Id*.).  He declined to complete the

section concerning her Level of Functional Impairment.  (*Id*.).

Standard initially approved Ms. Harvey's claim for STD benefits through May 10, 2009, but notified her by letter that it needed additional information to determine if benefits could continue.  (AR 101-03).  The next APS from Dr. Wilson, dated June 11, 2009, indicated that Ms. Harvey's primary diagnosis was degeneration of lumbar disc and that her treatment consisted of Lortab and physical therapy.  (AR 335).  Consistent with the previous APS, Dr. Wilson declined to complete the section concerning her Level of Functional Impairment.  (*Id*.).

Standard again informed Ms. Harvey that her STD benefits were scheduled to end and that additional information was needed to determine if  benefits could continue.  (AR 99-100).  The letter instructed Ms. Harvey to have her physician provide a copy of all medical records from March 4, 2009, to the present.  (*Id*.).

Standard received several additional records.  An Ortho/Neuro Questionnaire completed by Dr. Wilson on July 1, 2009, indicated that Ms. Harvey showed symptoms of pain and muscle spasms from degeneration of lumbar disc but declined to provide information concerning the amount of work activity she could tolerate for any employer.  (AR 331-34).  On July 8, 2009, Standard received a copy of the radiology report of Ms. Harvey's lumbar spine that was performed on April 13, 2009.  (AR 334).  The report stated: "[t]here is very mild degenerative disc disease at L3-L4.

No abnormal motion is seen during flexion and extension.  The pedicles are intact and that sacroiliac joint are unremarkable.  No evidence of fracture, destructive lesion or other abnormality is identified." (*Id.*).

Standard reviewed Ms. Harvey's records and determined she no longer met the Definition of Disability because she had not provided sufficient Proof of Loss, and thus her claim for STD benefits was closed.  (AR 632).  Ms. Harvey appealed the termination of her STD benefits.  (AR 631).  After receiving additional information, Standard determined Ms. Harvey was entitled to benefits under the STD policy for the maximum benefit period ending July 19, 2009, and paid benefits through that date.  (AR 51-56, 618-19).

### D.    Ms. Harvey's Claim for LTD Benefits

On August 27, 2009, Standard sent Ms. Harvey a letter explaining the process of transitioning from STD to LTD.  (AR 51-52).

Standard retained Dr. Mark Shih, a Physician Consultant Board-Certified in Physiatry, to review Ms. Harvey's file.  Dr. Shih's report noted that Ms. Harvey presented with issues of degenerative disc disease with chronic mechanical low back pain and noted exacerbations, but found there was no imaging evidence of nerve root impingement or spinal cord compression and no evidence of focal neurologic deficits on examination.  (AR 300).  Dr. Shih opined that Plaintiff appeared to have

8

exacerbated her condition around the time she stopped working but, by June 8, 2009, she appeared to have returned to her normal pre-epidural steroid injection state. (AR 300). He also opined that, as of June 8, 2009, she was reasonably capable of sedentary level work activities, but would require the accommodation of a sit/stand work environment. (AR 300).

Standard also retained Todd Meier, a Vocational Consultant, to review Ms. Harvey's file. Mr. Meier opined that an accommodation of providing a sit/stand work environment is a reasonable accommodation in the national economy for the occupation of bookkeeper. (AR 650).

On October 27, 2009, Standard sent Ms. Harvey a letter explaining its determination that she did not meet the "Own Occupation" definition of disability and, therefore, was not entitled to LTD benefits. (AR 439-44). Ms. Harvey, who was not represented by counsel at the time, appealed the decision. (AR 292-96).

Standard's Benefits Review Specialist, Gordon Harris, sent a letter on December 16, 2009, advising Ms. Harvey that the Plan afforded one independent review of the denial of her claim, and that her claim had been referred to the Administrative Review Unit (the "ARU") for review. (AR 30-31). Harris interviewed Ms. Harvey by telephone on December 22, 2009. (AR 291).

Harris sent Ms. Harvey another letter on January 7, 2010, advising that he had

requested another copy of Dr. Wilson's records and records from Maddox Pain Management, and requested that she call both providers to assure that the records would be released as soon as possible.  (AR 29).  On January 12, 2010, Harris spoke to Ms. Harvey about the status of obtaining her medical records and explained that the review period would be extended because he had not received the records.  (AR 27-28, 449-50, 537-38).

Standard then retained Dr. Hans Carlson, a Physiatry Physician Consultant, to review all of Ms. Harvey's medical records, including the new records received from Maddox Pain Management and Dr. Wilson.  (AR 218-29).  Dr. Carlson reviewed Ms. Harvey's CT myelogram and imaging studies and opined that the findings did not provide convincing support for a lumbosacral radiculopathy but rather supported a finding of mild degenerative changes.  (AR 219).  Dr. Carlson opined that it was reasonable to expect that Ms. Harvey could perform sedentary level work activities, and would do best with a sit/stand workstation, and additional limitation and restrictions of no constant bending or twisting, crouching, stooping or kneeling involving the lumbar spine.  (AR 219).  Dr. Carlson also opined that the records do not suggest that Ms. Harvey is impaired secondary to the side effects of medications. (AR 219).

The ARU completed its review of Ms. Harvey's appeal and, on March 15,

2010, sent Ms. Harvey a letter detailing its determination that Standard correctly denied her claim for LTD benefits.  (AR 498-518).   The letter stated that the administrative review process was complete.  (AR 507).

Ms. Harvey retained an attorney, Mr. Allenstein, who sent a letter to Standard on April 8, 2010, seeking to appeal Standard's March 15, 2010 decision, requesting a copy of the claim file and Group Policy, and requesting 60 days after receiving the documents to submit additional information.  (AR 494).  Standard agreed to perform an "extra-contractual review" of Plaintiff's LTD claim, which it stated was "not subject to regulatory timeframes," and it accepted Mr. Allenstein's request for 60 days to submit information.  (AR 492).[4]  On April 26, 2010, Standard sent a copy of the claim file and Group Policy to Mr. Allenstein.  (AR 426).

As additional evidence, Mr. Allenstein submitted an Affidavit of [Ms.] Harvey, medical records from Dr. Michael Kendrick, and a copy of an decision from the Social Security Administration ("SSA") awarding disability benefits to Ms. Harvey with an onset date of October 1, 2009.  (AR 178-88, 189-217).  On June 3, 2010, Mr. Allenstein indicated that he anticipated submitting a vocational report within the next 30 days.  (AR 397).

---

[4]  Ms. Harvey disputes the contention in Standard's letter that the second review is not governed by the same regulatory timeframes as the first appeal, but the court addresses that legal argument later in this Opinion.

On June 14, 2010, Standard requested that Ms. Harvey submit documentation supporting the basis for changing her onset date to October 1, 2009, in her claim with SSA.  (AR 395).  Because Standard had not received the vocational report nor documentation supporting the basis for changing her disability onset date with Social Security, Standard sent another letter requesting these documents on July 2, 2010. (AR 394).  On August 19, 2010, Ms. Harvey's counsel faxed Standard a vocational report by William Crunk, Ph.D.  (AR 366-69).

Standard also retained and received reports from Mary Lindquist, M.D., an Internal Medicine Physician, and Karol Paquette, MS, CRC, Vocational Case Manager.  Dr. Lindquist submitted her Physician Consultant Memo to Standard on August 31, 2010.  (AR 161-67).  Ms. Paquette's report, submitted on September 2, 2010, reviewed the limitations and restrictions from Dr. Carlson and Dr. Lindquist and determined that Ms. Harvey would be able to perform her own occupation of Bookkeeper given the limitations and restrictions.  Ms. Paquette also evaluated the report submitted by Dr. Crunk.  (AR 639-45).

Before Standard issued a determination on the additional "extra-contractual review" requested by Ms. Harvey, this lawsuit was filed on October 26, 2010.

## IV.   LEGAL STANDARDS

### A.      Standard on Summary Judgment[5]

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[6]  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific

---

[5]  Although this matter is before the court on Standard's motion summary judgment pursuant to Rule 56, the Eleventh Circuit recently noted that, due to the peculiar standards of review for ERISA cases, traditional Rule 56 practice may be unnecessary.  *See Doyle v. Liberty Life Assur. Co.*, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008).  Courts in this circuit have recognized that the summary judgment standard is not appropriate in ERISA cases where "the district court sits more as an appellate tribunal than as a trial court." *Curran v. Kemper Nat. Servs. Inc.*, 2005 WL 894840, at *7 (11th Cir. 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)); *see Ruple v. Hartford Life & Accident Ins. Co.*, 340 Fed. App'x 604, 611 (11th Cir. 2009) ("[The] typical summary judgment analysis does not apply to ERISA cases."); *Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005) ("[T]he Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time he or she made the decision.").

[6]  Rule 56 was amended in 2007 in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

facts showing that there is a genuine issue for trial.'" *Int'l Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955) ("Both parties filed and argued motions for summary judgment, but this does not warrant the granting of either motion if the record reflects a genuine issue of fact.").[7]  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See U.S. v. Diebold, Inc.*, 369 U.S. 654, 655  (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion.").  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  WRIGHT, MILLER & KANE, FED. PRACTICE & PROC. § 2720, at 327-28 (3d ed. 1998).

---

[7]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### B.     ERISA Standard of Review

ERISA does not contain a standard of review for actions brought under §
1132(a)(1)(B) challenging benefit eligibility determinations.  *Firestone Tire &
Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989) ("Although it is a 'comprehensive
and reticulated statute,' ERISA does not set out the appropriate standard of review
for actions . . . challenging benefit eligibility determinations.").  Moreover, the case
law that has developed over time governing such standards has significantly evolved.
A history of the evolution of these standards is useful to track its development and
shed light on the current framework.

In *Firestone*, the Supreme Court initially established three distinct standards
for courts to employ when reviewing an ERISA plan administrator's benefits
decision: "(1) *de novo* where the plan does not grant the administrator discretion; (2)
arbitrary and capricious where the plan grants the administrator discretion; and (3)
heightened arbitrary and capricious where the plan grants the administrator discretion
and the administrator has a conflict of interest."  *Capone v. Aetna Life Ins. Co.*, 592
F.3d 1189, 1195 (11th Cir. 2010) (citing *Buckley v. Metro. Life*, 115 F.3d 936, 939
(11th Cir. 1997) (discussing *Firestone*, 489 U.S. at 115)).  In *Williams v. Bellsouth
Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), *overruled on other grounds
by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008), the

Eleventh Circuit fleshed out the *Firestone* test into a six-step framework designed to guide courts in evaluating a plan administrator's benefits decision in ERISA actions. When the Eleventh Circuit created the *Williams* test, the sixth step of the sequential framework required courts reviewing a plan administrator's decision to apply a heightened arbitrary and capricious standard if the plan administrator operated under a conflict of interest.   *See id*.   The Eleventh Circuit later modified this step in response to the Supreme Court's ruling in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115-17 (2008), which concluded that a conflict of interest should be weighed merely as "one factor" in determining whether an administrator abused its discretion.   *See Doyle,* 542 F.3d at 1359 ("As we now show, *Glenn* implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's benefits decision.").   The Eleventh Circuit's latest iteration of the *Firestone* standard-of-review framework is found in *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 849:

> (1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2)   If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims;

if not, end judicial inquiry and reverse the decision.

(3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.[8]  All steps of the analysis are "potentially at issue" where a plan vests discretion to the plan administrator to make benefits determinations.  *See id.* at 1356 n.7.  Conversely, then, where a plan does *not* confer discretion, the court simply applies the *de novo* review standard established by the Supreme Court in *Firestone*. *See* 489 U.S. at 115 ("[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").

Here, because the Plan document unambiguously confers discretion to the

---

[8]  "In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." *Blankenship*, 644 F.3d at 1355 n.5.

administrator to determine eligibility for benefits and construe the terms of the Plan (AR 487)—as further discussed *supra*—all steps of the Eleventh Circuit's six-step framework are implicated. *Firestone*, 489 U.S. at 115; *Blankenship*, 644 F.3d at 1355-56.

## V.   ANALYSIS

The parties raise several critical issues in their briefs.  As a preliminary matter, Ms. Harvey contends that Standard never issued a final decision concerning its latest review of Ms. Harvey's claim, and, therefore, the *de novo* standard of review should apply in lieu of the Eleventh Circuit's multi-step framework.  Thus, the court first considers whether the extra-contractual appeal voluntarily undertaken by Standard affects the appropriate standard of review.  Next, Ms. Harvey contends that under either the *de novo* standard or the Eleventh Circuit's multi-step framework, Standard's determination denying LTD benefits was wrong and is due to be reversed because its decision was tainted by conflict of interest, rendering it arbitrary and capricious.  Standard argues that the multi-step framework applies rather than *de novo* review, that no conflict tainted its decision, and that its decision was rationally based upon the administrative record and relevant Plan language.

The court has carefully considered these issues and the parties' arguments. Based on its review of the administrative record in this case, the court concludes that

Standard possessed a reasonable basis for its benefits determination and that any existing conflict of interest did not render its decision arbitrary and capricious. Therefore, the court must uphold Standard's benefits determination.

### A. The Extra-Contractual Appeal Voluntarily Undertaken by Standard Does Not Alter the Standard of Review

The LTD Group Policy issued by Standard provided for one administrative appeal, which must be requested "in writing within 180 days after receiving notice of the denial." (AR 486). Standard's initial denial letter was dated October 27, 2009. (AR 33). Ms. Harvey filed her notice of her appeal as of right on December 12, 2009. (AR 292-94). Standard sent a letter on December 16, 2009, advising Ms. Harvey that her claim had been referred to the ARU. (AR 30-31). The ARU conducted its independent review, which involved an interview of Ms. Harvey, submission of additional medical records, and the review by Dr. Carlson. The ARU completed its review and sent a letter on March 15, 2010, informing Ms. Harvey of its determination that Standard correctly denied her claim for LTD benefits. (AR 498-518). The letter stated:

> You are entitled to one independent review of your claim under the terms of the Group Policy. We have completed that review, and have concluded that we will not be able to extend benefits to you. This concludes the administrative review process by the Administrative Review Unit.

(AR 507) (emphasis added).

Thereafter, Ms. Harvey's attorney, Mr. Allenstein, sent a letter to Standard on April 8, 2010, that purported to appeal the denial by the ARU unit.  (AR 494-95).  Standard was under no obligation by the terms of the Plan to perform a second review.  Nevertheless, Standard responded to Mr. Allenstein's request by letter dated April 19, 2010, by which it "agree[d] to perform an extra-contractual review (i.e., a second review by The Standard's Administrative Review Unit)," but stipulated that "[t]his review will not be subject to regulatory timeframes."  (AR 492).  Still, Standard "committed to completing a timely review" and authorized sixty days for Mr. Allenstein to submit additional information.  *Id.*

Mr. Allenstein submitted additional information over the course of the next four months, faxing his last document – the vocational report by Dr. Crunk – to Standard on August 19, 2010.  (AR 366-69).  After receiving these additional documents, Standard obtained a Physician Consultant Memo from Dr. Lindquist (AR 161-67) on August 31, 2010, and a report from Vocational Case Manager Karol Paquette (AR 639-45) on September 2, 2010.  Before Standard issued a decision on its extra-contractual review, Ms. Harvey filed this lawsuit on October 26, 2010.

Ms. Harvey now argues that *de novo* review must be applied by this court because "Standard never issued a final decision."  (Doc. 9 at 8).  To support her

position, she cites two Tenth Circuit opinions for the proposition that "when substantial violations of ERISA deadlines result in the claim's being automatically deemed denied on review, the district court must review the denial *de novo*, even if the plan administrator has discretionary authority to decide claims." *Gilbertson v. Allied Signal, Inc*., 328 F.3d 625, 631 (10th Cir. 2003) (emphasis added); *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment &Dependent Life Ins. Plan,* 605 F.3d 789, 798 (10th Cir. 2010).[9]  Ms. Harvey also cites the Eleventh Circuit opinion *Torres v. Pittston Co.*, 346 F.3d 1324, 1333-34 (11th Cir. 2003), which discussed, without reaching a holding on the issue, the concept of "deemed denials"[10] in relation to the standard of review.

The court finds that Standard's failure to render a decision on the voluntary, extra-contractual review before Ms. Harvey filed this lawsuit does not constitute a "deemed denial" as contemplated by *Gilbertson* and the applicable Department of Labor Regulations.   The "deemed denial" cases Ms. Harvey relies on are inapposite

---

[9]  "*Gilbertson*'s holding was based on the sensible notion that an ERISA 'plan administrator is not entitled to the deference of arbitrary and capricious review when [the administrative] appeal[ ][was] 'deemed denied' because the administrator made no decision to which a court may defer.'" *LaAsmar,* 605 F.3d at 798 (emphasis added) (citation omitted).

[10]  The Court in *Torres* explained that the "operative ERISA regulations" pertaining to "deemed denials," flow from "the former 29 C.F.R. § 2560.503-1(e)(2), [which] provided that, if an ERISA plan administrator did not act on a claim for benefits within the allotted time-at that time, 90 days from the date of receipt of the claim, with some possibility for extensions-"the claim shall be deemed denied and the claimant shall be permitted to proceed to the review stage." *Torres*, 346 F.3d at 1332.

and easily distinguished because, as Standard observes, none implicate situations involving a voluntary appeal after the initial determination and completion of the first appeal.  Instead, the cases involve situations where the plan administrator failed to issue an initial decision on the claim, or a decision on the first appeal of the claim, within the regulatory time limits.  *Cf. Gilbertson,* 328 F.3d at 631 ("... LINA never issued a decision denying Mrs. Gilbertson's appeal. LINA and AlliedSignal have conceded their failure to render a decision prior to the deadline (whatever it is) and do not contest Mrs. Gilbertson's contention that the claim must be 'deemed denied' pursuant to ERISA regulations."); *LaAsmar,* 605 F.3d at 799 ("Although MetLife eventually denied the LaAsmars' claim on administrative review, it did so substantially outside the time period within which the Plan vested it with discretion to interpret and apply the Plan.  Thus, it was not acting within the discretion provided by the Plan." (emphasis added)).  Here, by contrast, Standard timely issued final determinations on both its initial review and the administrative appeal provided by the Plan.  Standard advised Ms. Harvey by letter dated March 15, 2010, that the administrative review process by the ARU was complete and she was entitled to pursue her ERISA remedies.  (AR 498-518).

Unlike the "deemed denial" cases cited by Ms. Harvey, Standard cites to several cases that are factually on point and instructive to the issue of whether

Standard's election to undertake a voluntary additional review alters the standard of review. For instance, in *DaCosta v. Prudential Ins. Co. of America*, No. 10-CV-720(JS)(ARL), 2010 WL 4722393, at *1 (E.D.N.Y. Nov. 12, 2010), the court squarely considered "what impact, if any, ERISA has on 'voluntary appeals' that an insurer conducts after denying an insured's initial ERISA-mandated appeal." In that case, the parties "agree[d] that ERISA does not require insurers to provide or conduct voluntary appeals." *Id.* However, like Ms. Harvey, the plaintiffs in *DaCosta* contended that "if an insurer chooses to provide voluntary appeals, these appeals must fully comply with ERISA's rules and regulations." *Id.* The court disagreed. In a well-reasoned and thorough analysis of the relevant Regulations, the court determined that voluntary appeals are not subject to the same requirements as mandatory appeals. *Id.* at *4-6. In particular, the court considered and persuasively analyzed 29 C.F.R. § 2560.503-1(c)(3), a provision that specifically addresses "voluntary appeals."

Similarly, in a very factually analogous case, the court in *Mattox v. Life Ins. Co. of North America*, 536 F. Supp. 2d 1307, 1322 (N.D. Ga. 2008), rejected the plaintiff's argument that the *de novo* standard of review should apply because the plan administrator never issued a decision on her second appeal. The court reasoned:

> Mattox also argues that LINA's failure to issue a decision after Mattox's second appeal constitutes a "deemed denial" and that the *de novo* standard therefore should apply rather than a heightened arbitrary and

> capricious standard. *See, e.g., Gritzer v. CBS, Inc.*, 275 F.3d 291, 295-96
> (3d Cir. 2002) (applying the *de novo* standard where an administrator
> has been afforded discretion but has not exercised that discretion).
> However, LINA did in fact issue two detailed decisions with regard to
> Mattox's claim: the initial termination on September 2, 2003, and the
> denial of her first appeal on July 29, 2004, and the Court has ample
> evidence that Mattox did in fact exercise its discretion with regard to
> Mattox's claim. *Cf. Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98,
> 109 (applying the *de novo* standard for deemed denials because "the
> court [is left] without any decision or application of expertise to which
> to defer"). As a result, the *de novo* standard does not apply to LINA's
> decision to terminate Mattox's LTD Benefits after twenty-four months.

*Id.* at 1322 n.20.  Like the plan administrator in *Mattox,* Standard has issued two

detailed decisions regarding Ms. Harvey's claim – the initial termination on October

27, 2009, and its denial of her first appeal on March 15, 2010.  Thus, the court "has

ample evidence that [Standard] did in fact exercise its discretion with regard to [Ms.

Harvey]'s claim."  *Id.*

Another factually analogous case Standard identified is *Watts v. Metropolitan

Life Ins. Co.*, No. 09cv829 WQH (WVG), 2011 WL 1585000, at *11 (S.D. Cal. Apr.

26, 2011), in which the court noted:

> Plaintiff contends that *de novo* review is required because Watts did not
> receive a decision on her request for a second appeal.  The Court applies
> an abuse of discretion standard of review on the grounds that Watts
> received a decision on her appeal and was not entitled to a second
> appeal.  *See Porco v. Prudential Ins. Co. of Am.*, 682 F.Supp.2d 1057,
> 1073–73 (C.D. Cal. 2010) ("Nothing in the statutory or regulatory
> structure of ERISA, however, gives [plaintiff] a right to file a second
> appeal before proceeding in district court ....").

*Id.* at *11 n.2.

Based on the persuasive guidance of *DeCosta*, *Mattox*, *Watts*, and the relevant Regulations, the court finds that the extra-contractual review Standard elected to undertake after final completion of the review mandated by the Plan constitutes a "voluntary appeal" that is not subject to the regulatory time frames.[11]   Therefore, Ms. Harvey's argument that Standard's failure to render a decision on her second appeal within the ERISA regulatory time frames is a "deemed denial" that requires *de novo* review is without merit.   The court will apply the Eleventh Circuit's multi-step framework for arbitrary and capricious review.

## B.    Eleventh Circuit Framework

### 1.    Step One

At the first step of the analysis, the court is called to apply the "*de novo* standard" to determine whether Standard's benefits-denial decision is "wrong" (i.e., whether the court disagrees with the its decision).[12]   If Standard's decision is "*de*

---

[11]   Persuasive policy considerations also support the court's conclusion, as outlined in *DeCosta*, 2010 WL 4722393, at *6.   "As a general principle, courts are hesitant to impose additional burdens on a party by virtue of that party voluntarily doing more than the law requires."   *Id.*

[12]   As other courts have noted, the *de novo* review contemplated in the first step of Eleventh Circuit's ERISA analysis is "somewhat confusing" because it differs from the *de novo* standard of review applied in other contexts.   *Hawkins v. Arctic Slope Regional Corp.*, 344 F. Supp.2d 1331, 1335 n.6 (M.D. Fla. 2002).   For instance, the scope of review in the first step of ERISA analysis is limited to the administrative record:

A decision is "wrong" if, after a review of the decision from a *de novo* perspective,

*novo* wrong," the court should proceed to the next step; if not, the court should end

its inquiry and affirm the decision.  *Blankenship*, 644 F.3d at 1355.

The court has thoroughly reviewed the extensive medical documentation in this

case chronicling Ms. Harvey's history of chronic back and leg pain.   It is

uncontroverted in her medical records that her pain is attributable to her medically

documented diagnosis of degenerative disc disease, consistently noted in her records

as "degeneration of the lumbar disc." (*See, e.g.,* AR 162, 267, 331, 335, 336).  Her

treating doctors – and even the consulting doctors – have documented the

exacerbation of her pain beginning in the spring of 2009, around the time she came

out of work on short-term disability.  (*See, e.g.,* AR 240, 263, 274, 299-301).  Ms.

Harvey's subjective complaints of severe back pain are supported by prescriptions to

heavy narcotics and pain medications such as morphine and oxycodone that are

replete throughout the record.  (*See, e.g.,* AR 238, 241, 282-88, 291).  The court

---

"the court disagrees with the administrator's decision." *See Williams [v. BellSouth Telecomm., Inc.],* 373 F.3d [1132,] 1138 & n. 8 [(11th Cir. 2004)]; *see also HCA Health Servs. [v. Emp. Health Ins. Co.],* 240 F.3d [982,] 993 n. 23 [(11th Cir. 2001)]. The record is restricted to "the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir.1989).

*Eldridge v. Wachovia Corp. Long-Term Disability Plan,* No. 06-12193, 2007 WL 117712, at *1 (11th Cir. Jan. 18, 2007) (unpublished).  "Accordingly, the use of the term *de novo* in determining whether a claims administrator's decision is 'wrong,' apparently means in this circuit that the court reviews the denial without deference or any presumption of correctness based upon the administrative record alone, without considering any extrinsic evidence."  *Hawkins,* 344 F. Supp.2d at 1335 n.6.

identifies no material inconsistencies or other indicators in the record that cast doubt on Ms. Harvey's credibility.  Rather, several letters in the record – one submitted by her former employer – strongly attest to her credibility and character and witness to the physical hardships she experienced in her work environment due to the reality and severity of her pain.  (AR 295-96).  Further, Ms. Harvey's back pain has been treated by epidural blocks that appear not to have provided any significant relief.  (AR 218, 240, 502).  Surgery is not an option to alleviate her persistent pain.  (AR 233, 515). Although physical therapy treatments resulted in some "slow" progress, other treatment notes post-physical therapy efforts reflect visibly observable pain.  For instance, Dr. Maddox's notes from November 7, 2009, observed that Ms. Harvey's pain was so great that "she [wa]s having great difficulty sitting down and sitting primarily on her left butt cheek with the right side basically not touching anything" throughout the exam.  (AR 231).  At an office visit with Dr. Wilson on July 22, 2009, Ms. Harvey reported that she "attempted to return to work, but was unable to continue due to her pain." (AR 251).  And at her appointment with Dr. Kendrick on March 12, 2010, he observed that she was "unable to sit with erect posture or adequate alignment" and that she had "poor functional mobility when pain is severe and is extremely fearful of certain positions and remains guarded and apprehensive throughout her weightbearing and nonweightbearing motion."  (AR 208).

Considering the medical record as a whole, the court finds it reasonable to conclude that Ms. Harvey's degenerative disc disease triggered debilitating pain of such an increasing degree that Ms. Harvey could no longer perform the duties of her Own Occupation beyond the benefit waiting period – i.e., that she is Disabled under the Plan.  Based on her readily observable pain, demonstrated by her inability to sit or stand for long periods during her medical examinations, it would be reasonable to conclude that she would likewise have trouble sitting or standing at work to perform the duties of even a sedentary position such as bookkeeper with a sit/stand accomodation.  Therefore, the court disagrees with Standard's decision to deny her application for LTD benefits.  However, even finding that Standard's decision was "*de novo* wrong," the court must still proceed to the next steps of the Eleventh Circuit's analysis and accord the appropriate level of deference due to Standard's determination as the plan administrator.

### 2.    Step Two

The court must next consider whether Standard was vested with discretion in reviewing claims. *Blankenship*, 644 F.3d at 1355.  This issue is disputed.  The terms of the Plan, however, are clear and undisputed:

28

## ALLOCATION OF AUTHORITY

Except for those functions which the Group Policy specifically reserves to the Policyholder or Employer, we [Standard] have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation and application of the Group Policy.

Our authority includes, but is not limited to:

….

3.      The right to determine:

        a.  Eligibility for insurance;

        b.  Entitlement to benefits;

        c.  The amount of benefits payable; and

        d.  The sufficiency and the amount of information we may reasonably require  to determine a., b., or c., above. Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

(AR 487).

Ms. Harvey acknowledges that the terms of the Plan "include discretionary authority language and a named administrator."  (Doc. 13 at 2).  However, she contends that because "[n]o entity granted discretionary authority to Standard," the *de novo* standard of review should apply instead of the arbitrary and capricious

29

standard. (Doc. 13 at 7).[13]  The court disagrees.  The terms of the Plan are clear and unambiguous, expressly allocating to Standard the authority to make benefits determinations and construe the terms of the Plan.  Like other similar cases in the Eleventh Circuit, the court finds that these terms are sufficient to vest Standard with discretion and thus trigger the arbitrary and capricious standard.  *See, e.g., Lee v. BellSouth Telecomm., Inc.*, 318 Fed. App'x 829, 836 n.1 (11th Cir. 2009) (recognizing similar language as granting plan administrator discretionary authority to determine benefits eligibility) *Guy v. Se. Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir. 1989) (same).  Even more on point, two district court opinions from the Ninth Circuit (that Ms. Harvey cites elsewhere as persuasive authority) applied the arbitrary and capricious standard to their review of ERISA plans issued by Standard that contain similar, if not identical, language concerning allocation of authority: *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1176, 1185 (N.D. Cal. 2011); *Sacks v. Standard Ins. Co.*, 671 F. Supp. 2d 1148, 1151-52, 1165 (C.D. Cal. 2009).

Moreover, Ms. Harvey's attorney has previously unsuccessfully attempted to raise similar arguments advocating the *de novo* standard of review before this court. The court finds that this case is analogous to a recent ERISA case in which this court

---

[13]  Ms. Harvey attempts to distinguish a reservation of authority from an express delegation of authority, but her argument is unpersuasive and not supported by the cases upon which she relies.

evaluated similar plan language – and similar arguments from the same plaintiff's counsel – and determined that the terms of the plan unambiguously conferred discretion to the plan administrator. *See McCay v. Drummond Co.*, Case No. 2:08-CV-1978-VEH, 2011 WL 5438950, at *15 (N.D. Al. Nov. 10, 2011). Similarly, Mr. Allenstein's argument "that an insurance company cannot retain discretionary authority" has been made and rejected before other judges in this district. *See, e.g., Ray v. Sun Life & Health Ins. Co.*, 752 F. Supp. 2d 1229, 1231-32 (N.D. Al. 2010) (Bowdre, J.), *affirmed by* 443 Fed. App'x 529 (11th Cir. 2011).

Finally, Ms. Harvey's attorney's argument that the *de novo* standard of review must apply where an ERISA benefits provider vests discretion in itself contradicts binding Eleventh Circuit authority. Specifically, in *Blankenship*, the Eleventh Circuit applied the arbitrary and capricious standard where "Defendant MetLife serve[d] as both the Plan's administrator of claims and also the payor of benefits" and "[t]he Plan vest[ed] MetLife with discretionary authority to interpret the Plan's terms and to determine whether a claimant is disabled under the Plan." 644 F.3d at 1352-53, 1356 n.7. The material facts are no different here. Therefore, consistent with the Eleventh Circuit's approach in *Blankenship* and the other cases cited above, the court agrees with Standard that the arbitrary and capricious standard applies, and the court proceeds to the next analytical step.

31

### 3.      Step Three

At this step, the court must determine whether any "reasonable grounds" supported Standard's decision to deny benefits – in other words, the court must apply the more deferential arbitrary and capricious standard. *Blankenship*, 644 F.3d at 1355. In making this determination, the court is "limited to the record that was before [Standard] when it made its decision." *Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1247 (11th Cir. 2008) (citing *Jett*, 890 F.2d at 1139).[14] After reviewing the administrative record and Standard's stated reasons for denying Ms. Harvey's claim, the court cannot say that "no reasonable grounds exist" in support of Standard's decision. *Blankenship*, 644 F.3d at 1355. Therefore, the court must conclude at this step that Standard's decision was reasonable and, accordingly, that it was not arbitrary and capricious.

To prove her entitlement to LTD benefits under the Plan, Ms. Harvey was required to demonstrate that she was Disabled from her Own Occupation throughout the 90-day Benefit Waiting Period and beyond, as those terms are defined in the Plan. (AR 507).[15] Because she ceased working on April 13, 2009, due to back pain, her

---

[14] Because Standard's final determination was rendered on March 15, 2010, the court does not consider any records or documents submitted after that date.

[15] Several provisions throughout the Plan make plain that the burden of proof rests on the claimant, in this case, Ms. Harvey. For instance, the "Insuring Clause" of the Plan provides: "If you become Disabled while insured under the Group Policy, we will pay LTD Benefits according

Benefit Waiting Period ran from April 13, 2009, through July 13, 2009.  *Id.*  After detailing in ten pages his consideration of the medical records and documents provided by Ms. Harvey, as well as the assessments of the medical and vocational consultants retained by Standard, Mr. Harris, on behalf of the ARU, concluded that Ms. Harvey "d[id] not meet requirements for the Own Occupation Definition of Disability for the Group Policy beyond the end of the Benefit Waiting Period and [her] claim remains denied."  (AR 507).

In reviewing Standard's decision, the court finds that it is rationally based upon the administrative record and supported by reasonable grounds.  Overall, Standard's decision is reasonable based on Ms. Harvey's failure to satisfy the Proof Of Loss provision of the Plan.  Specifically, the court observes at least three independent

---

to the terms of the Group Policy <u>after we receive Proof Of Loss satisfactory to us</u>."  (AR 470) (emphasis added).  The Plan further defines "Proof Of Loss" as follows:

> Proof Of Loss means written proof that you are Disabled and entitled to LTD benefits.  Proof Of Loss must be provided at your expense. For claims of Disability due to conditions other than Mental Disorders, <u>we may require proof of physical impairment that results from anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques</u>.

(AR 485) (emphasis added).  The Plan also provides that claims must be supported by satisfactory documentation, provided at the claimant's expense as requested by Standard:

> Completed claims statements, a signed authorization for us to obtain information, <u>and any other items we may reasonably require in support of a claim must be submitted at your expense</u>.  If the required documentation is not provided within 45 days after we mail our request, your claim may be denied.

(AR 485) (emphasis added).

grounds that support the reasonableness of Standard's decision to deny benefits based on a failure of proof.

> **a)** **Ms. Harvey did not submit any medical records that explicitly deem  her disabled beyond the benefit waiting period.**

Although Ms. Harvey contends that she "has submitted . . . uncontroverted medical evidence of disability" (doc. 9 at 6), the court disagrees insofar as "Disability" is defined by the Plan.  After reviewing the medical record, the court finds that Standard reasonably concluded that the documentation Ms. Harvey provided falls short of satisfying the requirements of proving that she meets the Plan's Own Occupation Definition of Disability *beyond* the Benefit Waiting Period. In other words, Ms. Harvey's medical records fail to demonstrate that she suffers from an ongoing or continuing Disability that would render her "unable to perform with reasonable continuity the Material Duties of [her] Own Occupation." (AR 473).

Ms. Harvey seems to rely heavily on the assessment of her treating physician, Dr. Wilson, on April 13, 2009 (the date she came out of work), which opined that

> Ms. Harvey's pain has gotten to the point that she can no longer work. We are going to put her on <u>short-term</u> disability, and begin physical therapy several times a week.  She will return to see me in 6 weeks.  We will refill her pain medications. . . .

(AR 263) (emphasis added).  However, this early assessment does not make any conclusion or speculation as to Ms. Harvey's <u>long-term</u> capacity for working, as it

does not predict or diagnose a disabling physical limitation of an extended or permanent nature.  Instead, Dr. Wilson required that Ms. Harvey return in six weeks – less than the 90-day Benefit Waiting Period – for further evaluation.  His opinion as to her "short-term disability" necessarily expired after the six weeks evaluation period, pending further assessment or diagnosis.

If Dr. Wilson, or any of Ms. Harvey's treating physicians, had followed up with an assessment that later extended the projection of her disability, this could have been a different case.  But importantly, and as Standard noted in its decision affirming denial of Ms. Harvey's application for LTD benefits, **none of Ms. Harvey's medical records expressly indicate that she <u>continued</u> to be Disabled after the 90-day Benefit Waiting Period**.  Notably, Dr. Wilson never converted his short-term disability diagnosis into a long-term disability diagnosis, nor did he even extend the time period for which he determined her to be under a short-term disability.  In fact, when specifically asked to give Standard his opinion as to whether Ms. Harvey continued under a disability, Dr. Wilson repeatedly declined to do so.  As noted by Mr. Harris in Standard's final determination letter addressed to Ms. Harvey:

> . . . You have not provided any information contemporaneous to your November 1, 2009 letter from Dr. Wilson, which would substantiate your assertion that he <u>continues to recommend</u> your preclusion (restriction) from performing full-time sedentary level work. Furthermore, as I have noted in this letter, on three occasions between

April-July 2009, Dr. Wilson declined to explain your functional capacities.

(AR 507) (emphasis added).  As Mr. Harris ultimately concluded:

> Therefore, after considering all of the medical documentation in the claim file, and the physical demands and temperaments required for your occupation, the Physician Consultants and I find no basis to support that you have <u>remained</u> Disabled from performing your Own Occupation with reasonable continuity after June 8, 2009.  As a result, you do not meet requirements for the Own Occupation Definition of Disability for the Group Policy beyond the end of the Benefit Waiting Period and your claim remains denied.

(AR 507) (emphasis added).  Stated differently, Mr. Harris found that the medical documentation provided by Ms. Harvey was insufficient to carry her burden under the Plan of proving that she met the Own Occupation of Disability beyond the benefit waiting period, which closed on July 13, 2009.  This decision was reasonable. Without medical records from any of Ms. Harvey's treating physicians – her attending physician, her pain management physician, or even her physical therapist – that confirm she could no longer perform the duties of her Own Occupation due to disabling pain after July 13, 2009, Standard reasonably denied her application for LTD benefits for failure of proof under the terms of the Plan.

b)   **Ms. Harvey's medical records do not expressly demonstrate that she was unable to perform the material duties of her Own Occupation.**

Moreover, the court identifies a significant gap in Ms. Harvey's medical records: they contain no proof of her functional limitations or her occupational capacity. Although the medical records document Ms. Harvey's subjective pain complaints and various treatments related to her degenerative disc disease, none of the records – other than Dr. Wilson's short-term disability prognosis rendered on April 13, 2009 – confirm her disability status or assess her functional limitations in relation to her ability to perform her occupational duties as a bookkeeper. The record demonstrates that both Standard and Ms. Harvey repeatedly requested those assessments from Dr. Wilson, but to no avail. (AR 233-34, 331-33, 335-36).

As Ms. Harvey's counsel correctly identifies, "[t]he issue in this case is whether Ms. Harvey is unable to perform her present occupation." (AR 402). However, other than her subjective complaints, the only other evidence in the record supporting Ms. Harvey's inability to perform her job duties is a letter from her former employer, Jeff Owens, which states that "[Ms. Harvey's] local doctor informed her that if she kept sitting at her job, she would further damage the situation and the pain would get worse." (AR 295). Yet the court has identified no record from Dr. Wilson – or any of Ms. Harvey's other attending physicians – that corroborates such a

statement or even supports the conclusion.  In the absence of documented medical evidence that Ms. Harvey could no longer perform the material duties of her Own Occupation, or that her condition would worsen should she return to work, Standard reasonably denied her claim under the terms of the Plan.

> **c)** **The objective medical tests in Ms. Harvey's record do not demonstrate permanent or long-term disability.**

Additionally, the medical tests supplied by Ms. Harvey, on the whole, do not objectively demonstrate permanent or long-term disabling results.  X-rays performed on April 13, 2009, to measure Ms. Harvey's complaints of back pain showed that:

> There is <u>very mild</u> degenerative disc disease at L3-L4.  <u>No abnormal motion is seen during flexion and extension.</u>  The pedicles are intact and the sacroiliac joints are <u>unremarkable</u>.  <u>No evidence of fracture, destructive lesion or other abnormality is identified</u>.

(AR 262) (emphasis added).  Notes from Dr. Wilson's office on April 20, 2009, instruct staff to "[t]ell [Ms. Harvey] her xrays show no instability or other abnormality." (AR 260).  The HR Lumbar Myelogram performed on August 6, 2009, resulted in the following findings:

> The thecal sac is of adequate size throughout the lumbar region. <u>Minimal</u> ventral flattening of the thecal sac is noted at the L3-4 and L4-5 levels.  <u>Normal and symmetrical nerve root sleeve filling is noted throughout the lumbar region</u>.

(AR 248) (emphasis added).   The results of the CT Lumbar Spine test with myelographic contrast and multiplanar reconstruction performed on the same date were "negative" and the specific findings were as follows:

> L1-2 - No abnormality.
> L2-3 - No abnormality.
> L3-4 - No abnormality.
> L4-5 - No abnormality.
> L5-S1 - No abnormality.
>
> There is no evidence of disc herniation, central canal stenosis or neural foraminal encroachment.
>
> Nerve roots of the cauda-equina have an unremarkable appearance.

(AR 249) (emphasis added).  Dr. Wilson reviewed the CT myelogram on August 31, 2009, and observed that it "demonstrates some diffuse degenerative changes without significant disc herniation or nerve root encroachment." (AR 244) (emphasis added). Dr. Wilson noted, "I certainly do not see a surgical lesion." *Id.*  In sum, Ms. Harvey's test results reflect normal, unremarkable, or "very mild" findings; nothing in the objective medical testing records evince a severe or permanently disabling condition.

Finally, the physical therapy treatment notes consistently call for "conservative" treatment and render a "good" or "fair" prognosis for her full rehabilitation.[16]  On March 12, 2010, Physical Therapist T. Rashad Pearson treated

---

[16] Ms. Harvey's treating physician, Dr. Wilson, referred her to the physical therapists at Wilhoite & Associates, P.C., for physical therapy sessions.

Ms. Harvey and assessed her rehabilitation potential as "fair to good." (AR 208). On April 30, 2009, Physical Therapist David L. Wilhoite treated Ms. Harvey and indicated in his assessment that she "should respond to a conservative PT program" and noted that her rehabilitation potential was "good." (AR 256). On June 8, 2009, Wilhoite signed a joint progress summary report with Dr. Wilson that assessed Ms. Harvey "[h]as shown some progress [with] P.T. programs," and that "[i]t is anticipated [additional] relief can be had from continuation of lumbar traction to maximum of 60-75 [pounds]. . . ." (AR 255). At that point, Ms. Harvey had attended 15 out of 15 of the scheduled physical therapy visits, and the statement of goals was marked as "partially" accomplished. *Id.* In the same report, Wilhoite and Dr. Wilson noted that the patient reported that she was experiencing progress in physical therapy and expressed willingness to try the lumbar traction approach. *Id.* In sum, the physical therapy records indicate strong rehabilitation potential and overall progress toward rehabilitative goals throughout the course of treatment.

As Mr. Harris stated in the March 15, 2010, benefits determination letter:

I must emphasize that . . . I understand that you have a history of chronic low back pain. However, the findings in your medical records indicate that your pain has been in the 5/10 range (i.e., moderate pain) and on physical examination you have not shown any evidence of muscle atrophy or focal neurologic impairments. You have described your back pain as severe, but your physicians, including Drs. Wilson, Poczatek and

<u>Maddox</u>, have consistently described your pain on physical exam as "tenderness."

(AR 507) (emphasis added).  Standard's interpretation of the essentially "normal" and "unremarkable" test results and positive treatment records constituted reasonable grounds to deny Ms. Harvey's application for LTD benefits.

For any of the above-stated reasons, many of which are addressed in Mr. Harris's 10-page determination letter, reasonable grounds supported Standard's decision to uphold the denial of Ms. Harvey's application for LTD benefits.  Further, because Standard reasonably decided to deny benefits based on the insufficiency of the records to demonstrate satisfactory Proof Of Loss under the Plan, the court need not address at this step the reasonableness of Standard's reliance on the medical and vocational consultants independently retained by Standard to review the file.

### 4.    Steps Four Through Six

Because reasonable grounds exist to support Standard's decision, the court turns to the last steps of the inquiry, which collectively ask whether Standard operated under a conflict of interest.  If not, the court should end its inquiry and affirm.  But if so, the court should consider the conflict as "merely . . . a factor . . . to take into account when determining whether [Standard]'s decision was arbitrary and capricious."  *Blankenship*, 644 F.3d at 1355.  Because Standard both determines and

pays benefits under the Plan, the court must consider the inherent structural conflict of interest in this case as a factor.  *Glenn*, 554 U.S. at 108 (holding that where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket . . . this dual role creates a conflict of interest . . . ."). "[T]he significance of the factor will depend upon the circumstances of the particular case." *Id.*

    Ms. Harvey insists that Standard's decision denying benefits was tainted by its conflict of interest.[17]  Specifically, she describes five indicators of conflict: (a) Standard's alleged disregard of the treating physician's opinion in favor of biased in-house record reviewers; (b) Standard's allegedly inconsistent position awarding STD benefits but denying LTD benefits; (c) Standard's disregard for the favorable Social Security determination; (d) Standard's disregard of Ms. Harvey's vocational expert (Dr. Crunk) and letters from her employer; and (e) Standard's "history" of abuse of discretion.  (Doc. 41 at 15–28).  The court addresses each allegation in turn.

--------

[17]  Standard admits the structural conflict of interest but argues that it "mitigated the effect of any structural conflict by seeking opinions from *three* outside physician consultants and agreeing to a voluntary extra-contractual review at Plaintiff's request."  (Doc. 17 at 8-9) (emphasis in original).  Standard cites the Eleventh Circuit's unpublished opinion in *Keith v. Prudential Insurance Co. of America,* 347 Fed. App'x 548, 552 (11th Cir. 2009) as an example of the Court "affirming [the] district court's finding that no evidence existed to show [the plan administrator] was influenced by the conflict of interest where it obtained 3 different doctors and considered the evidence again when plaintiff asked for reconsideration."  *Id.*

### (a)   Standard Did Not Disregard Any Treating Physician's Opinion in Favor of Biased "In House" Reviewers.

Ms. Harvey first contends that Standard disregarded the opinion of her treating physician in favor of biased in-house record reviewers.  She cites *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) for the proposition that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  Tellingly, however, **Ms. Harvey's counsel fails to identify any specific record(s) or opinion(s) of her treating physician that Standard allegedly disregarded or "refused to credit."** It is impossible for the court to gauge whether Standard refused to credit certain treating physician records without knowing which records to evaluate.  Nevertheless, the court has expended ample time reviewing the medical records in this case and finds that Standard fully regarded the records from Ms. Harvey's treating physician, Dr. Wilson, as well as her other doctors.  Therefore, the court does not accept Ms. Harvey's summary and underdeveloped argument that Standard "disregard[ed] the opinion of [her] treating physician."  (Doc. 41 at 15).[18]

_____

[18]   The court also dismisses Ms. Harvey's passing and undeveloped argument that the "[s]ubmission of unsigned reports by record reviewers prior to signing reports with the inference that Standard reviews and approves all reports before being signed" is an additional indicator of conflict.  (Doc. 41 at 28).  This argument is wholly undeveloped and without support; therefore, the court is under no obligation to consider it.  *See Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument);

As to Ms. Harvey's related argument that the three medical professionals retained by Standard to assess Ms. Harvey's claim file are biased "in house" reviewers, the court is not persuaded.  As evidence, Ms. Harvey submits under seal a heap of documents she obtained during discovery,[19] including confidential independent contractor agreements between Standard and Dr. Shih, Dr. Carlson, and Dr. Lindquist; tax returns for all three doctors; and 64 pages of confidential medical record reviews completed by Dr. Shih for Standard during 2009.  (Doc. 42).  Ms. Harvey argues that this discovery "shows that the three medical record reviewers who reviewed [her] claim were 'in house' record reviewers who worked exclusively at Standard Insurance Company."  (Doc. 42 ¶ 10).  The court disagrees.

Although the documents submitted by Ms. Harvey demonstrate that Dr. Shih, Dr. Carlson, and Dr. Lindquist were retained by Standard as independent contractors and paid for their work reviewing medical records, nothing in the documents objectively demonstrates or even implies that the reports of those doctors were tainted by bias or by structural conflict of interest.  Ms. Harvey's counsel prepared a chart to inform the court of the total number of reviews performed and the annual income

---

*Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

[19]  By previous Order, the court granted Ms. Harvey's Motion To Compel seeking discovery into Standard's alleged conflict of interest.  (Doc. 37).

44

earned by Dr. Shih, Dr. Carlson, and Dr. Lindquist from the years 2007 to 2010. (Doc. 41 at 15).  The chart has no inherent probative value on the issue of whether these doctors were biased reviewers.  In fact, Ms. Harvey presents <u>no</u> persuasive arguments demonstrating how or why the opinions of these doctors were biased or tainted the particular result in this case.

The only argument pursued by Ms. Harvey's counsel to demonstrate bias is the brief analysis of Dr. Shih's 479 record reviews from 2009.  (Myron Allenstein Aff., Doc. 42, Ex. 10).  Mr. Allenstein explains that, of the 479 record reviews, he focused on 121 that he identified as "appeal reviews" and determined that 82 percent of those cases were recommended for denial.[20]  However, Mr. Allenstein's affidavit is completely without any <u>substantive analysis</u>.  Again, the court stresses that it is not required to consider perfunctory and undeveloped arguments from counsel.  *See supra*, fn. 18.  However, even reading between the lines of Mr. Allenstein's undeveloped argument, the court finds that it lacks any probative value, given the fundamental difference between an initial review (i.e., where no previous determination has been made) versus a review on appeal (i.e., where a previous denial has necessarily been rendered).  Moreover, the fact that a claim was ultimately closed or denied by Standard does not necessarily relate to Dr. Shih's review.  As Standard

---

[20]  These figures and analysis are disputed by Standard.  (Doc. 47 at 14).

notes, "Dr. Shih and the other independent consultants do not make recommendations, rather they review medical records and provide opinions concerning the individual claimant's limitations and restrictions." (Doc. 47 at 14).

For all these reasons, Ms. Harvey has not met her burden of persuading the court that bias of the record reviewers retained by Standard affected Standard's benefits decision. *Blankenship*, 644 F.3d at 1355 ("'[T]he burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest'" (quoting *Doyle*, 542 F.3d at 1360)). Moreover, as stated earlier, the court finds that Standard had multiple grounds, independent of the consulting opinions, upon which it was reasonable for it to deny Ms. Harvey's application for benefits.

### (b)    Standard Did Not Take Inconsistent Positions

Second, Ms. Harvey points to Standard's allegedly inconsistent position awarding STD benefits but denying LTD benefits as an indicator of conflict. The court sees no merit to this argument because it identifies no inconsistency between the decisions, which were based on different plan documents and terms of eligibility. As the court detailed *supra*, Ms. Harvey's medical records, including her records from Dr. Wilson, fail to demonstrate that she was under a *continuing* disability *beyond the benefit waiting period*, which is what Ms. Harvey was required to prove

under the LTD Group Policy in order to receive benefits.  In short, Ms. Harvey's

application for LTD benefits fell short because Dr. Wilson's short-term disability

prognosis never converted to a long-term disability diagnosis.

Therefore, Ms. Harvey's exclusive reliance on *Levinson v. Reliance Standard*

*Life Insurance Co.,* 245 F.3d 1321 (11th Cir. 2001) to support her argument on this

point is misplaced.  Ms. Harvey argues that *Levinson* stands for the principle that

"when a recipient of disability benefits submits credible proof of *continuing* disability

pursuant to the plan, the burden of proof shifts to Defendant to produce medical

evidence that the recipient is no longer disabled."  (Doc. 41 at 20 (emphasis added)).

Putting aside the debate about whether *Levinson* is still good law in the Eleventh

Circuit, the court finds *Levinson* inapposite because the facts of that case materially

differ from this case.  In *Levinson,*

> The district court noted that Levinson <u>continued to provide proof of his
> continuing total disability throughout the litigation</u>, and because of that,
> Reliance could not argue that Levinson failed to perform his duties
> under the part of the insurance contract requiring the insured to furnish
> proof of disability.  <u>The court also found that there was sufficient
> evidence to find that Levinson was still "Totally Disabled" under the
> policy</u>, and that Reliance had not shown Levinson's condition had
> improved.

245 F.3d at 1329 (emphasis added).  By contrast, the court here has recognized Ms.

Harvey's failure of proof as a reasonable grounds for Standard to deny her LTD

benefits application.  Accordingly, the court is not persuaded by *Levinson* or the overall facts of this case that a material inconsistency exists between Standard's decisions on Ms. Harvey's separate applications for STD and LTD benefits.

### (c)    Standard Did Not Disregard the SSA Opinion.

The third indicator of conflict raised by Ms. Harvey is her assertion that Standard's decision denying benefits was tainted by its "disregard" for the favorable SSA decision. (Doc. 41 at 20). This argument is wholly without merit. The assertion that Standard "disregarded" the SSA opinion is misleading – if not disingenuous – because the favorable SSA opinion, dated May 25, 2010, was not before it at the time Standard rendered its decision on administrative review on March 15, 2010. Needless to say, Standard could not have "disregarded" what was not before it – and, indeed, not even yet in existence – on the date of its decision.

Moreover, the SSA opinion is beyond the scope of this court's review on appeal, as the court is limited to consideration of the administrative record as it existed on the date of Standard's final determination, which was March 15, 2010. *Glazer,* 524 F.3d at 1247; *Jett*, 890 F.2d at 1139.  Ms. Harvey did not submit the

favorable SSA decision to Standard until June 7, 2010. As such, that document is not properly before the court.[21]

> **(d)      Standard Did Not Disregard Dr. Crunk's Report or the Letters from Ms. Harvey's Employer**.

Likewise, the court dismisses Ms. Harvey's argument that Standard "disregarded" the vocational evaluation of Dr. Crunk, which was not submitted to Standard until June 24, 2010, more than three months after the final decision of Standard's ARU unit. (AR 161-76). The court cannot consider that document in the scope of its review of Standard's March 15, 2010, decision. *Glazer,* 524 F.3d at 1247; *Jett*, 890 F.2d at 1139. Moreover, even if it could, the court notes that the document lacks a credible foundation because it fails to explain the basis of its evaluation. Ms. Harvey argues that Dr. Crunk's evaluation "supported total disability," but, as Standard correctly observes, it is "unclear what Dr. Crunk reviewed as part of his evaluation." (Doc. 18 at 2).

---

[21]   Even if the court could properly consider the belated submission of the favorable SSA opinion, the court notes that its probative value is less than conclusive. *See Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997) ("Although a court may consider this information in reviewing a plan administrator's decision regarding eligibility for benefits under an ERISA-governed plan, an award of benefits by the Social Security Administration is not dispositive of the issue before us." (internal citation omitted)); *see also Ray*, 2011 WL 5025539, at *3 ("[W]hile approval of social security benefits may be considered, it is not conclusive on whether a claimant is also disabled under the terms of an ERISA plan.").

As to the letter from Ms. Harvey's employer, Jeff Owens, and the email from Allen Roberts, Ms. Harvey develops no argument as to why Standard's alleged "disregard" of these documents rendered its decision arbitrary and capricious. The court need not address Ms. Harvey's perfunctory and underdeveloped argument. *See Supra*, fn. 18. Nevertheless, the probative value of these two documents is questionable, as Standard observes, because they do not address the suggested possibility of a sit/stand accommodation at the workplace. (Doc. 47 at 19).

### (e)     Standard's Alleged "History" of Abuse of Discretion

Finally, Ms. Harvey contends that Standard has a "history of abuse of discretion." (Doc. 41 at 24). To support this history of abuse, Ms. Harvey cites only two district court cases from the Ninth Circuit: *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172 (N.D. Cal. 2011), and *Sacks  v. Standard Ins. Co.*, 671 F. Supp. 2d 1148 (C.D. Cal. 2009). As Standard argues, the probative value of these cases is diminished because the out-of-circuit decisions concerned denial of claims under different benefit plans. Moreover, the court has carefully reviewed these cases and finds that the findings of conflict were heavily based on "case-specific factors." *See Sacks*, 671 F. Supp. 2d at 1164-65 ("In weighing the evidence, this Court finds that an analysis of the case-specific factors establishes that Standard's claim decision was tainted by its financial interest."). In *Sacks*, for instance, the court considered "case-

specific factors" such as Standard's "fail[ure] to investigate the claim adequately, fail[ure] to measure plaintiff's disability by correct Plan criteria, and fail[ure] to engage in a 'meaningful dialogue'" as mandated by the law of that circuit, among others. *Id.* at 1166. In *Oster*, the court recognized at least eight different indicators of conflict, largely relating to Standard's failure to provide a "full and fair review," which are not apparent in this case. *Oster*, 759 F. Supp. 2d at 1186-88.[22] Because the material facts of both cases are significantly distinguishable from this case, the court is not persuaded by Ms. Harvey's argument that Standard's determination in *this* case was tainted.

For all these reasons, the court finds that Standard's decision denying LTD benefits, which was supported by reasonable grounds as discussed *supra*, was not tainted by conflict of interest. To the extent any conflict existed, Ms. Harvey has not met her burden of establishing persuasive indicators that the conflict so tainted Standard's decision such as to render it arbitrary and capricious. *Doyle*, 542 F.3d at 1360 ("[T]he burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.");

---

[22] For example, among the case-specific factors identified in *Oster* that are not present here, the court observed that Standard ignored raw data of certain positive test results, denied the claimant an opportunity to respond over a three-year period, refused to provide certain data to claimant's counsel for a prolonged period, made no attempt to obtain certain relevant medical records or contact the claimant's physicians, and relied on the same consulting physician during the initial denial and the appeal process. *Oster*, 759 F. Supp. 2d at 1187-88.

51

*accord Blankenship,* 644 F.3d at 1357 ("Blankenship has not sufficiently shown, and our independent review of the record has not indicated, that the structural conflict of interest in this case had sufficient 'inherent or case-specific importance' for us to overturn MetLife's benefits decisions." (citation omitted)).

Moreover, evaluating any potential conflict in a "case-specific" context, *Glenn*, 544 U.S. at 117, the court finds that the alleged conflict identified by the Plaintiff would not have a determinative effect on the outcome of this particular case because the court has already concluded that independent reasonable grounds supported Standard's benefits decision.  Finally, the court reiterates the guidance from *Blankenship* that the court still owes deference to the decisionmaker despite the existence of structural conflict of interest.  *Blankenship,* 644 F.3d at 1355 ("Even where a conflict of interest exists, courts still owe deference to the plan administrator's discretionary decision-making as a whole." (quotation marks and citation omitted)).

To echo *Blankenship* in its concluding words, the court "decide[s] nothing today about whether the plan administrator's decisions were absolutely correct in reality.  They may possibly not have been.  But given the deference owed by courts to the discretionary benefits decisions of plan administrators, [the court] cannot conclude on this record that [Standard]'s benefits decisions were unreasonable or

were arbitrary and capricious due to the conflict of interest." *Id.* at 1357. Accordingly, Standard's decision must be affirmed according to the Eleventh Circuit's ERISA framework.

## VI.   CONCLUSION

In sum, the court finds that Standard's decision was reasonable based on the terms of the Plan and the administrative record.  Moreover, the court does not find any persuasive indicators that conflict of interest tainted Standard's decision. Therefore, Standard's decision was not arbitrary and capricious and stands to be affirmed.  Accordingly, Standard's Motion for Summary Judgment is due to be granted and  Plaintiff's Motion for Judgment is due to be denied.  The court will enter a separate Final Judgment Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this the 29th day of March, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge